UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN EDWARD
GASPAR,

               Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY
ADMINISTRATION,

               Defendant.

_____/

Case No. 2:19-cv-12989
District Judge Arthur J. Tarnow
Magistrate Judge Anthony P. Patti

## REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 12), GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 14), and AFFIRM THE COMMISSIONER'S DECISION

**I.   RECOMMENDATION**:  For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment (ECF No. 12), **GRANT** Defendant's cross-motion for summary

judgment (ECF No. 14), and **AFFIRM** the Commissioner's decision.

**II.   REPORT**

      Plaintiff, Steven Edward Gaspar, brings this action under 42 U.S.C. §§

405(g) and/or 1383(c)(3) for review of a final decision of the Commissioner of

Social Security ("Commissioner") denying his application for disability insurance

(DI) benefits.  This matter is before the United States Magistrate Judge for a

Report and Recommendation on Plaintiff's motion for summary judgment (ECF No. 12), the Commissioner's cross-motion for summary judgment (ECF No. 14), Plaintiff's reply (ECF No. 16), and the administrative record (ECF No. 8).

### A.    Background and Administrative History

Plaintiff filed the DI and SSI applications in May 2016, alleging that his disability began on February 1, 2014, at the age of 43. (R. at 237, 249, 155.)  In his disability report, he alleged that certain conditions (acute systolic (congestive) heart failure/disease; diabetes mellitus type 2, uncontrolled; chronic leg pain; lumbar/sciatic nerve pain; hypertension; arthritis/ osteoarthritis; pancreatitis; restless leg syndrome; insomnia; and, muscular fatigue) limit his ability to work. (R. at 273.)  In August 2016, the SSA found Plaintiff to be disabled as to his SSI claim (R. at 108-123, 141) but not disabled as to his DI claim (R. at 124-139, 140, 147-154).  The SSA's SSI Notice of Award is dated October 3, 2016. (R. at 155-170; *see also* R. at 190-195.)

On October 17, 2016, Plaintiff requested a hearing by an Administrative Law Judge ("ALJ"), presumably with respect to the initial finding on his DI claim. (R. at 171-172.)  On March 1, 2018, ALJ Colleen M. Mamelka held a hearing, at which Plaintiff, his wife (Donna Lee Gaspar), and a vocational expert (VE), Norman Abeles, testified. (R. at 55-107, 366-423; *see also* R. at 343-344.)  On

June 22, 2018, ALJ Mamelka issued an opinion, which determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 39-54.)

On August 21, 2018, Plaintiff submitted a request for review of the hearing decision.  (R. at 233-236.)  However, on August 6, 2019, the Appeals Council denied Plaintiff's request for review.  (R. at 1-7.)  Thus, ALJ Mamelka's decision became the Commissioner's final decision.  Plaintiff timely commenced the instant action on October 10, 2019.[1]

### B.    Plaintiff's Medical History

The administrative record contains approximately 539 pages of medical records, which were available to the ALJ at the time of the June 22, 2018 decision. (R. at 54, 424-962 [Exhibits 1F-28F].)  Importantly, many of these records post-date Plaintiff's March 31, 2015 date last insured (DLI), and the Appeals Council noted that the additional evidence dated August 2018 "does not relate to the period at issue."  (R. at 2, 42, 20-38.)  Plaintiff's medical records will be discussed in detail, as necessary, below.

### C.    The Administrative Decision

---

[1] As set forth in the Appeals Council's August 6, 2019 notice, Plaintiff had "60 days to file a civil action (ask for court review)[,]" "[t]he 60 days start the day after you receive this letter[,]" and "[w]e assume you received this letter 5 days after the date on it unless you show us that you did not receive it within the 5-day period."  (R. at 2-3.)  Thus, although there are 65 days from the date of the letter to the filing of this lawsuit, the complaint is timely.  Moreover, the Commissioner does not appear to argue otherwise.

Pursuant to 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), at **Step 1** of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity (SGA) during the period from his alleged onset date (AOD) of February 1, 2014 through his DLI of March 31, 2015.  (R. at 44.)  At **Step 2**, the ALJ found that, through the DLI, Plaintiff had several severe impairments (diabetes mellitus (DM), neuropathy, sciatica, and pancreatitis).  (*Id*. at 44.)  At **Step 3**, the ALJ found that, through the DLI, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (*Id*. at 45.)  **Between Steps 3 and 4** of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[2] and determined that, through the DLI, Plaintiff had the RFC:

> . . . to perform sedentary work . . . [*i.e., exertional limitations*] except he was able to occasionally climb ramps or stairs, balance, kneel, crouch, or crawl.  He was unable to climb ladders, ropes, or scaffolds [*i.e., postural limitations*] or be exposure[d] to unprotected heights, moving machinery, or extreme cold or heat [*i.e., environmental limitations*].

(*Id*. at 45-47.)  At **Step 4**, the ALJ determined that, through the DLI, Plaintiff was unable to perform any past relevant work.  (*Id*. at 47-48.)  At **Step 5**, considering

---

[2] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); *Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002).

Plaintiff's age, education, work experience, and RFC, the ALJ found that, through

the DLI, there were jobs that existed in significant numbers in the national

economy that Plaintiff could have performed.  (*Id.* at 48-49.)  The ALJ therefore

concluded that Plaintiff was not under a disability, as defined in the Social Security

Act, at any time from February 1, 2014, the AOD, through March 31, 2015, the

DLI.  (*Id.* at 49.)

### D.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final

administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case

under the Social Security Act, the Court "must affirm the Commissioner's decision

if it 'is supported by substantial evidence and was made pursuant to proper legal

standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see

also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as

to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under

this standard, "substantial evidence is defined as 'more than a scintilla of evidence

but less than a preponderance; it is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241

(quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).  In deciding whether substantial evidence supports the ALJ's decision, the

court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## E.    Analysis

Preliminarily, while the Court appreciates Plaintiff's attachments to the motion for summary judgment, he need not attach anything that is already part of

the transcript filed by the Commissioner.  Moreover, any references to the administrative record that appear within Plaintiff's filings should be made to the transcript (*i.e.*, not to motion exhibits).  Turning attention to the substance of Plaintiff's appeal, he takes issue with the ALJ's consideration of:  (1) his treating doctors' findings; (2) his multiple impairments and symptoms; and, (3) the VE's opinion.  (ECF No. 12, PageID.1042-1050; *see also* ECF No. 16.)

### 1.    Whether the ALJ appropriately considered his treating doctors' findings?

Plaintiff's first statement of error concerns the ALJ's consideration of his treating doctors' findings, namely those of neurologist Xi Guo, M.D., primary care physician Emily Gabbeart, M.D., and neurologist Bruce M. Silverman, D.O. (ECF No. 12, PageID.1043-1044.)  Plaintiff has the burden of proof on this issue. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### a.    Xi Guo, M.D. (treating neurologist)

It appears that Plaintiff began treatment with Dr. Guo in November 2012. (R. at 762-765.)  The December 26, 2012 EMG study was "abnormal," with Dr. Guo noting "electrodiagnostic evidence of mixed axonal and demyelinating sensory motor polyneuropathy affecting the bilateral lower extremities[,]" but also noting "no electrodiagnostic evidence of lumbar radiculopathy."  (R. at 755.) Plaintiff's treatment with Dr. Guo continued in December 2012 (R. at 750-754), as

well as January, February and March 2013 (R. at 759-760, 758-759, 756-758).[3] The ALJ's written decision acknowledges Dr. Guo as Plaintiff's physician and expressly cites some of his records.  (R. at 46-47.)

### b.    Emily Gabbeart, M.D. (primary care physician)

It appears that Dr. Gabbeart treated Plaintiff as early as September 2013 (R. at 744-745, R. at 748-749), and then in 2014 (R. at 737-738, 724-728, 705-706, 699-700, 688-690, 684-685) and January 2015 (R. at 429).[4]  The ALJ identified Dr. Gabbeart as Plaintiff's physician and specifically cited at least five of her records – dated September 2013, January 2014, April 2014, September 2014, and January 2015.  (R. at 46-47.)

### c.    Bruce M. Silverman, D.O. (treating neurologist)

Dr. Silverman treated Plaintiff in August, October and perhaps even November 2015.  (R. at 572-579, 655-657.)  Each of these post-dates Plaintiff's March 31, 2015 DLI.  Nonetheless, the ALJ acknowledged Dr. Silverman as a neurologist, noted that the initial treatment occurred in August 2015, referred to the normal neurologic evaluation, and referenced the possible diabetic polyneuropathy

---

[3] On February 2, 2018, Dr. Guo noted "[a]bnormal findings on diagnostic imaging of other abdominal regions, including retroperitoneum[.]"  (R. at 932.)  However, this date is well-past the March 31, 2015 DLI.

[4] Dr. Gabbeart's records dated 2017 (R. at 951-956, 947-951, 942-946, 936-941) post-date Plaintiff's DLI.

diagnosis.  (R. at 46, 572-574.)  Also, with apparent reference to Dr. Silverman's

October 9, 2015 study, the ALJ noted that an electromyography (EMG) "revealed

only early sensory neuropathy[.]"  (R. at 46, 577, 657.).

### d.    "Treating sources" and "medical opinions"

In part, Plaintiff relies upon 20 C.F.R. §§ 404.1527, 416.927.  (ECF No. 12,

PageID.1042-1044.)  Plaintiff may be correct that Drs. Guo, Gabbeart, and

Silverman each qualify as a "treating source."  20 C.F.R. §§ 404.1527(a)(2),

416.927(a)(2).  (*Id*., PageID.1043.)  However, the Commissioner correctly points

out that Plaintiff "misapprehends the governing law[,]" because the opinion

evidence regulations apply to "medical opinions," *i.e.*, not the mere *records* – from

treating sources Drs. Guo, Gabbeart and Silverman (or the EMGs) – upon which

Plaintiff relies.  (ECF No. 14, PageID.1405-1407; ECF No. 12, PageID.1043-

1044.)  *See* 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1) ("Medical opinions are

statements from acceptable medical sources that reflect judgments about the nature

and severity of your impairment(s), including your symptoms, diagnosis and

prognosis, what you can still do despite impairment(s), and your physical or mental

restrictions.").  Plaintiff seems to concede this point by omitting discussion of this

argument in his reply.  (*See* ECF No. 16, PageID.1428-1430.)  Moreover, while

Plaintiff's statement of error cites Dr. Wood's consultative examination report (R.

at 766-773), regarding which the Court notes the ALJ did not make an express

9

assignment of weight, Plaintiff seems to acknowledge that "the State's medical expert" is not a treating source.  (ECF No. 12, PageID.1043.)[5]  Accordingly, the Court should conclude that Plaintiff has withdrawn her argument that "the ALJ failed to properly apply the 'treating physician rule' and failed to give good reasons in the decision for the weight provided each treating source . . . ."  (ECF No. 12, PageID.1043-1044.)

### e.   Failure to consider or mention certain findings

If, instead, Plaintiff simply intended to argue that the ALJ "failed to consider . . all of the treating doctors' findings[,]" (R. at 12, PageID.1043), or that the ALJ's discussion of his treating physicians' records was not a "careful consideration of the entire record," (R. at 44-45), these arguments are unavailing.  The ALJ's written decision represents that she considered "all the evidence," "the entire record," or "the evidence."  (R. at 42, 44, 45, 46.)  The ALJ's review of the medical evidence expressly cites to records – albeit not every record – from each of the treating physicians, *i.e.*, Drs. Guo, Gabbeart and Silverman (R. at 46-47), as set forth in more detail above.

---

[5] It appears that the ALJ's only express assignments of weight were "only some weight" to the opinion of state agency consultant B. D. Choi, M.D. (R. at 116-120, 132-136) and "little weight" to the March 2017 RFC form (R. 822-827) and February 2018 form (R. at 891) signed by Rhonda Tocco APRN BC.  (R. at 47.) Although Plaintiff mentions these items in his brief, they do not appear to be the bases of his statements of error.  (*See* ECF No. 12, PageID.1037.)

Plaintiff alleges that the ALJ failed to consider and/or mention:

- Dr. Gabbeart's "assessments and problems of neuropathy" dated September 23, 2013 (R. at 744-745), April 29, 2014 (R. at 724-728), July 2, 2014 (R. at 705-706), July 22, 2014 (R. at 699-700), September 30, 2014 (R. at 688-690), and January 13, 2015 (R. at 429);

- Dr. Guo's March 20, 2013 neuropathy assessment (R. at 756-758, 760);[6] or,

- The abnormal December 26, 2012 and October 9, 2015 EMG studies (R. at 755, 575-577, 655-657)

(ECF No. 12, PageID.1044).  However,  even though the ALJ did not use the word "abnormal," to describe the EMG studies, he referred to each of them, even if not by date:  (a) the December 2012 EMG "showed signs of polyneuropathy in his legs[,]" and "showed no lumbar radiculopathy[,]" (*see* R. at 755); and, (b) the October 2015 EMG "revealed only early sensory neuropathy," (*see* R. at 575-577, 655-657).  (R. at 46-47.)  Moreover, any failure on the ALJ's part to reference Dr. Silverman's October 9, 2015 diagnosis of "bilateral lumbar radiculopathy" or impression of "[a]bnormal nerve conduction studies . . . bilaterally . . . [,]" (R. at 575, 577, 655, 657; ECF No. 12, PageID.1044), does not illustrate an insufficiency in the ALJ's RFC assessment.  *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the

_____

[6] Plaintiff's brief identifies Dr. Guo's neuropathy assessment as dated July 2, 2014, but the Court suspects she intended to refer to Dr. Guo's notes dated March 20, 2013.  (*Compare* ECF No. 12, PageID.1044, *with id.*, PageID.1034.)

condition.").  Likewise, the same would be true of any failure on the ALJ's part to

mention the neuropathy discussed in the above-cited notes from Dr. Gabbeart

(dated September 23, 2013 to January 13, 2015) or when referring to the March 20,

2013 records from Dr. Guo (R. at 46, 756-758, 760).  (ECF No. 12, PageID.1044.)

To be sure, Plaintiff apparently contends that these matters are supported by

Mary C. Wood, M.D.'s August 1, 2016 neurological / consultative examination

report – which, <u>albeit post-DLI</u>, reflects, *inter alia*:

- "There is pain and swelling of the ankles and knees, especially, his knees."  (R. at 767.)

- "The gait was abnormal; it was antalgic."  (R. at 769.)

- "There was weakness on dorsiflexion and plantar flexion of the right foot."  (*Id.*)

- "Pinprick, light touch, temperature, and vibration senses were diminished in both legs in a socks distribution."  (R. at 770.)

- "poorly controlled diabetes mellitus complicated with peripheral neuropathy, congestive heart failure[,]" (*Id.*)

- "degenerative disc disease of the lumbosacral spine, arthritis of the right ankle and both knees."  (*Id.*)

(*Id.*, PageID.1043-1044.)[7]  However, the ALJ cited Dr. Wood's report on three

occasions – within the discussion of Plaintiff's "DM and neuropathy," "RLS and

---

[7] Same day imaging revealed "negative radiographic examination of the lumbar spine[,]" (R. at 771), but the right ankle x-rays revealed "probable posttraumatic osteoarthritis with loose bodies in the joint[,]" which was "most pronounced laterally." (R. at 772).

musculoskeletal disorders," and "hypertension, pancreas, and gallbladder conditions[,]" (R. at 46-47), in some cases to the same observations cited by Plaintiff.

In the end, to the extent Plaintiff argues that the ALJ did not consider or mention certain findings, and recognizing that "it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion," it is well settled that "'[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-508 (6th Cir. 2006) (quoting *Loral Defense Systems–Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir.1999) (citations and internal quotation marks omitted)).  As set forth in further detail below, the ALJ's decision "say[s] enough 'to allow the appellate court to trace the path of his reasoning.'" *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (quoting *Diaz v. Chater,* 55 F.3d 300, 307 (7th Cir.1995)).  (ECF No. 14, PageID.1419.)

### 2.  Whether the ALJ appropriately evaluated Plaintiff's multiple impairments and symptoms?

Plaintiff's second statement of error concerns the ALJ's evaluation of Plaintiff's multiple impairments and his symptoms.  (ECF No. 12, PageID.1044-1048.)  Plaintiff has the burden of proof on these issues.  *Walters*, 127 F.3d at 529.

### a.  The evaluation of symptoms, including pain

Plaintiff claims that the ALJ's decision does not adequately consider his symptoms, namely by not considering "all [his] symptoms, including pain, and the extent to which [his] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence[,]" and by rejecting "[his] statements . . . solely because the available objective medical evidence does not substantiate [his] statements." 20 C.F.R. §§ 404.1529(a),(c)(2), 416.929(a),(c)(2). (ECF No. 12, PageID.1046-1048.)

The SSA acknowledges that "symptoms, such as pain, are subjective and difficult to quantify," and, thus, provides that "any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The SSA will consider relevant factors, which include, *inter alia*, daily activities, pain, medication, and treatment. (*Id*.) "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3P, 2017 WL 5180304, *10 (S.S.A. Oct. 25, 2017).

### i.        Function report, testimony and decision

Plaintiff's wife completed the function report form.  (R. at 291-298.)

Therein, Plaintiff claims he "can't stay awake because of medications, physical

exhaustion, muscle fatigue[,]" "can't concentrate because of lack of sleep during

the night hours[,]" and further explains that he is "up and down most of the night

going to the bathroom," and he "can't sleep because of [RLS][.]"  (R. at 291-292.)

When asked about meals, Plaintiff explained that he "can't stand [or] walk long

enough[h] to prepare food[;] [he is] weak, tired & in pain[.]"  (R. at 293.)  He

explained that he does not do house or yard work, because he is "weak and tired

and get[s] winded[,]" and he is "in pain with dizziness[.]"  (R. at 293-294.)

Additionally, Plaintiff claims he does not "go out anymore because [he is] weak,

tired, tired, need[s] to be close to the bathroom."  (R. at 296.)  The alleged

medication side effects are dizziness, diarrhea, upset stomach, dry mouth,

tiredness, drowsiness, light-headedness, loss of appetite, and weakness.  (*Id*.)  (*See*

*also* R. at 296-298.)

At the administrative hearing, Plaintiff testified about pancreatitis, an issue

with his gall bladder, muscle fatigue, diabetes, neuropathy, heart failure, abdominal

pain, blood pressure, sciatica, bowel and bladder, RLS, knees, hands and fingers,

his wrist, and arthritis.  (R. at 61, 72-83, 86, 91, 93-94.)  Plaintiff testified that he

takes tramadol for pain, which makes him sleepy (although at one point he took

Norco, which caused depression); gabapentin for his RLS and neuropathy, which

causes lightheadedness and sometimes nausea; and, Flexeril as a muscle relaxant,

which "puts [him] out[.]" (R. at 87-89.)  He testified that his lower extremity

condition worsened from 2012 to 2015 and "is continuing." (R. at 89.)  He had a

walker and an oxygen device with him at the hearing.  (R. at 90.)  He testified that

he is not able to sleep through the night, wakes up every two hours – either to use

the restroom or due to his RLS and neuropathy; he has to take naps during the day.

(R. at 92.)  Also, Plaintiff's wife testified that Plaintiff "doesn't sleep at night,"

seemingly because he goes to the restroom often due to diabetes, "so he sleeps

during the day."  (R. at 98-99.)  She reiterated his issues with sleeping and going to

the bathroom.  (R. at 102.)

ALJ Mamelka cited to the function report, Plaintiff's testimony, and his

wife's testimony within the written decision.  (R. at 46.)  Moreover, the ALJ

determined that Plaintiff's "statements concerning the intensity, persistence and

limiting effects of [his alleged] symptoms are not entirely consistent with the

medical evidence and other evidence in the record for the reasons explained in this

decision."  (*Id*.)

### ii.    Chronic fatigue

As to Plaintiff's "chronic fatigue and his inability to sleep at night and

function during the daytime," Plaintiff points to the function report, his testimony,

and his wife's testimony.  (ECF No. 12, PageID.1044.)  However, the ALJ

acknowledged Plaintiff's alleged "trouble staying awake, physical exhaustion, and

muscle fatigue[,]" and his wife's testimony that he "had trouble sleeping at night

and needed to sleep during the day[,]" (R. at 46), and Plaintiff has not shown how

the sedentary RFC (which is the least demanding of the physical exertional

requirements described in 20 C.F.R. §§ 404.1567, 416.967), with its additional

postural and environmental limitations, is insufficient.

As to neuropathy and/or muscle fatigue, Plaintiff claims that certain of the

ALJ's findings are "misplaced and inaccurate[.]"  (ECF No. 12, PageID.1045.)

The ALJ noted that, when Plaintiff saw Dr. Silverman in August 2015, Plaintiff

"reported no diabetic neuropathy evaluation for two years[,]" (R. at 46), which

*accurately* reflects the neurologist's notes:  "He stated is [sic] been over two years

since his last assessment."  (R. at 574.)  The ALJ also cited Dr. Silverman as

having found "normal neurological signs, including strength, coordination, and

gait[,]" which is an *accurate* reflection.  (R. at 46, 573-574.)  If, instead, Plaintiff

meant to illustrate an inconsistency with Dr. Wood's report that Plaintiff's gait was

abnormal (R. at 769), it is of no import here, as the ALJ expressly acknowledged

that Dr. Wood found Plaintiff to have "diminished sensation in his legs" and

"poorly controlled DM with peripheral neuropathy[,]" (R. at 46, 769-770), *i.e.*, the

ALJ acknowledged Dr .Wood's conclusion as to Plaintiff's DM and peripheral neuropathy.

Plaintiff continues his fatigue argument by seeming to take issue with the ALJ's: (1) failure to describe Dr. Silverman's diagnosis of "bilateral lumbar radiculopathy" or impression of "[a]bnormal nerve conduction studies . . . bilaterally . . . [,]" (R. at 575, 577, 655, 657); (2) failure to mention records documenting fatigue, such as Dr. Gabbeart's November 14, 2013 notes (R. at 739-740), Dr. Gabbeart's July 22, 2014 notes (R. at 699-700), or July 22, 2014 emergency room notes (R. at 701-704); and, (3) omission of Dr. Gabbeart's diabetic neuropathy assessments dated July 2, 2014 (R. at 705-706) and July 22, 2014 (R. at 497-511, 699-704). (ECF No. 12, PageID.1045-1046.)[8] However, even if the ALJ did not cite every reference to fatigue within the medical record – which the ALJ is not required to do, *see Kornecky*, 167 F. App'x at 507-508, Plaintiff has not shown how the sedentary RFC (*i.e.*, the least demanding of the physical exertional categories in 20 C.F.R. §§ 404.1567, 416.967), with its additional postural and environmental limitations, is insufficient.

### iii. Pain

---

[8] To the extent Plaintiff refers to Dr. Gabbeart's November 2013 notes, Erika Giordano, D.O. authored the November 14, 2013 notes. (ECF No. 12, PageID.1045; R. at 739-740.)

Plaintiff claims that his "chronic fatigue . . . in combination with his prescribed medications for pain, severely limited his ability to function due to drowsiness." (ECF No. 12, PageID.1045, 1048.)  As to pain, Plaintiff notes:  (1) "his prescribed medications for pain," which cause drowsiness; and, (2) hospital admissions for "abdominal pain," such as June 27, 2014 (R. at 522-533, 709-710, 718-719), July 22, 2014 (R. at 497-511, 699-704), September 2014 (R. at 484, 691), and October 2014 (R. at 468, 676).  (ECF No. 12, PageID.1045-1046.)  Also, the Court's own review reveals that Plaintiff presented to the emergency department for abdominal pain in December 2014. (R. at 445, 668.)

But, the ALJ acknowledged Plaintiff's claims of "diabetic nerve pain, sciatica nerve pain, and ankle pain[,]" and "back pain."  (R. at 46.)  The ALJ also acknowledged pain in records dated November 2012 (lower back and knees), January 2014 (abdominal pain), July 2014 (left foot pain), January 2015 (back pain), and November 2015 (right ankle pain).  (R. at 46-47.)  Thus, the ALJ considered, at least, the location of Plaintiff's pain.  *See* 20 C.F.R. §§ 404.1529(c)(3)(ii), 416.927(c)(3)(ii).  And, it cannot be said that the ALJ ignored the evidence supporting Plaintiff's complaints of pain.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 726 (6th Cir. 2014) ("By ignoring the record evidence supporting Gentry's complaints of pain, including the ones over a number of years

made to her doctors from whom she received treatments with varying degrees of

success, the ALJ violated the agency's duty . . . .").

Moreover, while the ALJ's written decision does not mention medication

side effects, this topic was addressed within the function report (R. at 298) and at

the administrative hearing (R. at 88).  "As a threshold matter, the requirement that

the ALJ consider allegations of medical side effects does not mandate their explicit

mention in the written decision."  *Stec v. Comm'r of Soc. Sec.*, 432 F. Supp. 3d

719, 727 (E.D. Mich. 2020) (Leitman, J., *adopting report and recommendation of*

Whalen, M.J.).  "An ALJ . . . is not required to explicitly discuss every §

404.1529(c)(3) factor in that assessment[.]"  *Ausbrooks v. Astrue*, No. 5:12-cv-

12144-DRG, 2013 WL 3367438, at *19 (E.D. Mich. July 5, 2013) (Grand, M.J.).

In any event, some of the RFC's environmental limitations – "unable to . . . be

expos[ed] to unprotected heights, moving machinery," – logically address

Plaintiff's allegation that drowsiness is a medication side effect.  (ECF No. 12,

PageID.1038, 1045, 1048.)  20 C.F.R. §§ 404.1529(c)(3)(iv), 416.927(c)(3)(iv)

("[t]he type, dosage, effectiveness, and side effects of any medication you take or

have taken to alleviate your pain or other symptoms[.]").  Although there are two

indications of "moderate distress" and an indication that "[i]nitially the patient was

minimally responsive but after Narcan administration the patient is neurologically

intact," the Commissioner points to numerous notations within the relevant period

that Plaintiff was "alert[,]" (*see* R. at 436 [January 2015], 441, 449 [December 2014], 461, 469 [October 2014], 487 [September 2014], 500 [July 2014], 524 [June 2014]).  Thus, it appears that the ALJ "gave Plaintiff the benefit of the doubt by finding he had to avoid all exposure to unprotected heights and moving machinery[,]" (ECF No. 14, PageID.1415).

### iv.    Incontinence

As to Plaintiff's "uncontrollable bowel and bladder movements," Plaintiff points to his testimony and that of his wife (R. at 94, 99), as well as hospital records from June 27, 2014 (R. at 522-534, 707-719), July 22, 2014 (R. at 497-519, 701-704), September 29, 2014 (R. at 484-496, 691-698), and October 15, 2014 (R. at 468-481), as well as Dr. Gabbeart's January 13, 2015 progress note (R. at 429). (ECF No. 12, PageID.1045-1046.)[9]  The Court also notes Plaintiff's testimony that his biggest obstacle is his "bathroom problem[,]" and the fact that there was a break in the administrative hearing so that Plaintiff could use the bathroom.  (R. at 94, 100.)

Nonetheless, the ALJ acknowledged Plaintiff's wife's testimony that "he used the bathroom often."  (R. at 46.)  Plaintiff claims the ALJ's decision does not mention his "ongoing stomach/abdominal pain and episodes of diarrhea . . . [,]" in support of which he cites hearing testimony, such as pain lasting "[a]bout 12 to 13

---

[9] Dr. Gabbeart also saw Plaintiff on July 22, 2014.  (R. at 699-700.)

hours[,]" (R. at 74-78, 80, 94), and multiple pieces of medical evidence dated
January 2014 to January 2015, such as notes from Dr. Gabbeart (R. at 688-690,
429) or various emergency room visits.  (ECF No. 16, PageID.1428-1429; *see also*
ECF No. 12, PageID.1034-1035, 1046.)  However, Plaintiff's claim that the ALJ
"omits reference to pertinent treatment for abdominal pain and symptoms," (ECF
No. 16, PageID.1430), is belied by the ALJ's discussion of Plaintiff's "emergent
care for abdominal pain, in January 2014[,]" with imaging that "showed non-
obstructing bowel gas pattern and cholecystectomy clips[,]" and Dr. Wood's
assessment that Plaintiff "had recurrent pancreatitis due to gallstones."  (R. at 47,
535-552, 770.)  Additionally, the ALJ had earlier explained that Plaintiff's
pancreatitis did not meet or equal Listing 5.00, because there was no evidence that
"the condition did not respond to medical or surgical treatment[,]" or that "it was
severe or would last without proper treatment."  (R. at 45.)  Plaintiff answered
"no," when asked "Did you have to wear a protective undergarment?" – even if not
mentioned within the ALJ's written decision,  (R. at 78, 390.)

### v.    Summation

The ALJ's decision to discount Plaintiff's subjective allegations must be
given deference, as the ALJ was not required to accept Plaintiff's subjective
allegations at face value.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir.
2003) ("we are to accord the ALJ's determinations of credibility great weight and

deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying.") (citing *Walters,* 127 F.3d at 528); *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) ("an administrative law judge's credibility findings are virtually 'unchallengeable.'") (citing *Payne v. Comm'r of Soc. Sec.,* 402 F.App'x 109, 112–113 (6th Cir. 2010)). Here, the ALJ discussed Plaintiff's "DM and neuropathy," "RLS and musculoskeletal disorders," and "hypertension, pancreas, and gallbladder conditions[,]" and, in so doing, cited a reasonable amount of evidence – including records from the relevant period (February 1, 2014 to March 31, 2015) and otherwise – and ultimately summarized that "the above residual functional capacity assessment is supported by the diagnostic findings and the claimant's relatively conservative treatment."  (R. at 46-47.)  Plaintiff having failed to show error in the ALJ's treatment of the alleged chronic fatigue, pain, and incontinence, the Court should affirm the subjective statements finding.

### b.    The combined effect of multiple impairments

Plaintiff also contends that the ALJ did not consider the combined effect of his multiple impairments.  (ECF No. 12, PageID.1046-1048.)  The SSA "will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity[,]" and, if it finds "a medically severe combination of impairments," it "will consider

the combined impact of the impairments throughout the disability determination process."  20 C.F.R. §§ 404.1523(c), 416.923(c).  *See also Gentry*, 741 F.3d at 726 ("When viewed holistically, the record reflects that Gentry has ongoing and progressive physical impairments dating back to 1994, taking a turn for the worse in 2003, and growing increasingly complicated by 2009.").  Plaintiff likens his case to *Gentry*, where the Sixth Circuit found that the ALJ violated Section 404.1523 "by reviewing Gentry's various diagnoses and treating physicians one at a time[.]" *Gentry*, 741 F.3d at 726.  The court explained:

> The objective medical evidence does not support the ALJ's conclusions that most of Gentry's impairments had been sufficiently resolved, but instead reveals a patient who sought treatment from doctors who treated her for a number of injuries and illnesses that resulted in overlapping sources of pain. When discussing each doctor individually, the ALJ drew adverse conclusions because Gentry went months, and sometimes years, before returning to the same doctor.  But the record reveals that Gentry sought treatment from other specialists during these absences, usually for identical or related complaints of pain and psoriasis.  By 2005, Gentry's doctors themselves recognized the overlapping impairment caused by multiple conditions.

*Gentry*, 741 F.3d at 726.  Plaintiff argues that, when viewed holistically, "the record reflects that Mr. Gaspar has ongoing and progressive physical impairments dating back to at least 2012, which [took] a turn for the wors[e] in 2013 when he lost his job [seemingly the one with First Class Freight when he did not pass the Commercial Driver's License physical], and then grow increasingly complicated through 2015."  (ECF No. 12, PageID.1047; R. at 80-81, 86, 392-393, 398.)

24

Plaintiff makes two specific points, each of which is unavailing. First, perhaps referring to the ALJ's descriptions of his DM as controlled in April 2014 (R. at 724) or his hypertension as controlled in September 2013 (R. at 744-745), January 2015 (R. at 429), and August 2016 (R. at 770) (*see* R. at 46-47), Plaintiff claims that the evidence and testimony "do[] not support the ALJ's conclusions that Mr. Gaspar's impairments are either controlled or insufficient to preclude him from gainful employment." (*Id.*, PageID.1047.) To the extent Plaintiff alleges that the ALJ "failed to discuss treatment for uncontrollable DM[,]" (ECF No. 16, PageID.1430), the ALJ was not required to expressly cite Dr. Gabbeart's notes from April 29, 2014 (R. at 724-728), July 2, 2014 (R. at 705-706), or January 13, 2015 (R. at 429), and it is repetitive of his first statement of error (ECF No. 12, PageID.1044.)[10]

Second, Plaintiff bases his argument on the ALJ apparently drawing an adverse inference from a two-year absence of diabetic neuropathy evaluation (R. at 46, 574), presumably from 2013 to 2015. (ECF No. 12, PageID.1045, 1047.) Plaintiff contends that he is "an individual not blessed with insurance options,"[11]

---

[10] The record notes uncontrolled diabetes in September 2013 (R. at 745), diabetes "not stated as uncontrolled" in July 2014 and September 2014 (R. at 699, 688), and uncontrolled diabetes in March 2016 (R. at 642).

[11] It appears that Plaintiff may have been without insurance in April 2014. (R. at 724.) Within Plaintiff's review of Dr. Silverman's records, he notes that the October 9, 2015 EMG was conducted "[a]fter a delay due to insurance

and "sought treatment from other specialists during these absences," and "each of his doctors themselves recognize the overlapping impairments caused by multiple medical conditions." (ECF No. 12, PageID.1047.) Plaintiff claims that his combined x-rays, EMGs and "neurological findings," are "not inconsistent with his treating physicians' assessments, nor are they inconsistent with Mr. Gaspar's complaints of ongoing symptomology and pain." (ECF No. 12, PageID.1047-1048.) Although Plaintiff does not specify which x-rays and EMGs, the Court assumes Plaintiff is referring to items mentioned elsewhere in the motion – *i.e.*, the December 2012 and October 2015 EMGs (R. at 755, 577, 657), as well as the January 24, 2014 abdomen and chest x-rays (R. at 541-543), June 27, 2014 CT scan (R. at 530), the July 22, 2014 chest x-ray and head CT (R. at 503-504, 510-511, 703), the September 29, 2014 x-ray showing a "moderate amount of stool" (R. at 488-489, 491, 691), the October 15, 2014 ultrasound (R. at 472-473, 478), an October 20, 2014 abdomen and pelvis CT, which had an impressions of "[s]tatus post appendectomy and cholecystectomy," *but also "[n]o hydronephrosis or nephrolithiasis[,]"* (R. at 462-463, 465 (emphasis added)), a December 16, 2014 x-

---

coverage[.]" (ECF No. 12, PageID.1035.) At the administrative hearing, Plaintiff testified that he got medication for his neuropathy "once [he] got insurance back . . . ." (R. at 76, 388; *see also* R. at 434, 438, 954.) If Plaintiff intended to bring an argument that the ALJ faulted Plaintiff for a delay in treatment that was caused by a lack of insurance, it is undeveloped.

ray showing a "moderate amount of stool" (R. at 451-452, 454), and/or the January

20, 2015 lumbar spine x-ray (R. at 437-438).  (*See* ECF No. 12, PageID.1035,

1046.)[12]  Still, Plaintiff's argument that his subjective statements are "consistent

with the objective medical evidence and other evidence[,]" 20 C.F.R. §§ 404.1529,

416.929, asks the Court to reweigh the evidence (ECF No. 12, PageID.1046),

which it cannot do.  *Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472

(6th Cir. 1982).

Relatedly, Plaintiff claims that, as occurred in *Gentry*, "although the ALJ

stated that she considered all the medical evidence marked as exhibits," the ALJ

discounted the severity of his impairments "based on periodic improvements and

cessation of treatment"  by failing to "address certain portions of the record,"

including, in Plaintiff's words, "substantial evidence of continuing conditions that

were not resolved despite use of increasingly serious medications with after effects

of drowsiness."  *Gentry*, 741 F.3d at 723-724.  (ECF No. 12, PageID.1045, 1048;

ECF No. 16, PageID.1430.)  He contends that the record evidence "reflects

corresponding continued impairments or subsequent declines[.]"  (*Id.*)  And,

---

[12] The Court's review of the record reveals multiple other imaging studies within
the relevant period (*i.e.*, from February 1, 2014 to March 31, 2015), such as: (a) an
October 7, 2014 abdomen ultrasound, which was "[s]tatus post cholecystectomy,
otherwise normal abdomen ultrasound[,]" (R. at 482-483); and, (b)  a December
31, 2014 left thumb x-ray (R. at 442-443).  Thus, it seems that the October 7, 2014
ultrasound would provide further support for the ALJ's determination.

Plaintiff advocates that "a substantiality of the evidence evaluation does not permit a selective reading of the record."  (ECF No. 16, PageID.1429.)  *See Universal Camera Corp.*, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  However, an argument that the ALJ "cherry-picked" the record "is seldom successful because crediting it would require a court to re-weigh record evidence."  *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014).  Here, notwithstanding all of the evidence that the ALJ did in fact consider, the thrust of Plaintiff's argument is that this Court should in fact take another look and do just that… and decide otherwise.  This it cannot do.

In sum, the question before the Court is whether the ALJ's findings are supported by substantial evidence, *i.e*., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (internal citation omitted).  I believe they were.

### 3.    Whether the ALJ appropriately evaluated the VE's testimony?

Plaintiff's third and final statement of error alleges that the ALJ's decision "failed to consider the VE's opinion of work preclusion[.]"  (ECF No. 12, PageID.1048-1050.)  To be clear, at the March 1, 2018 administrative hearing, VE Abeles *initially* testified that neither Plaintiff's past work nor any work in the national economy would be available for a hypothetical individual with Plaintiff's

age, education and a *more* restrictive RFC (*i.e.*, including humidity) than that eventually determined by the ALJ.  (R. at 103-104, 416-417.)  However, it seems that the VE *mistakenly* included the bathroom limitations in his answer, which the ALJ had not stated within her hypothetical.  (R. at 104, 417.)  Upon clarification by the ALJ, the VE testified that such an individual could perform work as a surveillance-system monitor (DOT 379.367-010), a small parts (rotor) assembler (DOT 715.687-114), and an inspector, such as a printed circuit board assembly touch-up screener (DOT 726.684-110).  (R. at 104-105, 417-418; *see also* R. at 94-97.)  *Then*, the ALJ added a condition to the hypothetical, namely that, "due to having to take additional breaks for using the restroom or due to physically-induced symptoms such as pain, this individual would be off-task more than 15 percent of the work day."  (R. at 105, 418.)  When asked "[w]hat impact [it would] have, if any, on the jobs provided[,]" the VE testified, it "would clearly be work preclusive of the jobs I've listed and all other jobs in the national economy."  (*Id.*)

The ALJ used this testimony to support her Step 5 conclusion that, through the DLI, "there were jobs that existed in significant numbers in the national economy that the claimant could have performed[.]"  (R. at 48-49.)  Plaintiff contends that the ALJ "left out key opinion testimony," (ECF No. 12, PageID.1048), but the Undersigned wonders if Plaintiff has misconstrued the transcript (*compare id.*, PageID.1049 & ECF No. 16, PageID.1431, *with* R. at 104,

417).  Ultimately, Plaintiff contends that his "need for frequent bathroom breaks would preclude him from the required work schedule."  (ECF No. 12, PageID.1050.)  However, because he failed to succeed on his second statement of error regarding chronic fatigue, pain and incontinence, and because he appears to have misconstrued the transcript, Plaintiff's Step 5 argument is unavailing.[13]

### F.    Conclusion

Plaintiff has not shown error in the ALJ's consideration of the medical records or Plaintiff's subjective statements.  *Walters,* 127 F.3d at 529.  Accordingly, as detailed in the foregoing discussion, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment (ECF No. 12), **GRANT** Defendant's cross-motion for summary judgment (ECF No. 14), and **AFFIRM** the Commissioner's decision.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days after being served with a copy, as provided for in Fed. R. Civ. P. 72(b)(2) and E.D. Mich. LR

---

[13] If Plaintiff's citations to SSR 96-8p ("Assessing Residual Functional Capacity in Initial Claims"), 1996 WL 374184 (S.S.A. July 2, 1996), and 20 C.F.R. § 404.1520a(c) ("Rating the degree of functional limitation.") were intended to add a separate argument that he is unable to perform "sustained work" on a "regular and continuing basis," it is undeveloped.  (ECF No. 12, PageID.1049-1050; ECF No. 16, PageID.1431-1432.)

72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after being served with a copy of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated:   February 4, 2021

Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE